**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 25 CR 693 |
| | ) | Judge April M. Perry |
| MICHAEL RABBITT, | ) | |
| KATHERINE MARIE ABUGHAZALEH, | ) | |
| ANDRE MARTIN, and BRIAN STRAW | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**<u>DEFENDANTS' MOTION TO COMPEL</u>**

Defendants, by and through their respective counsel, respectfully move this Court, pursuant to Federal Rule of Criminal Procedure 16; *Brady v. Maryland*, 373 U.S. 83 (1963); and, the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the Constitution of the United States, for an order compelling the government to produce certain items of discovery identified below.

Defendants seek an order compelling the government to produce two categories of discovery. First, as detailed below, Defendants request that the government produce discovery to support a motion to dismiss for vindictive or selective prosecution, particularly records and communications relating to related to any improper influence exerted upon the U.S. Attorney's Office in the Northern District of Illinois that, out of the mass of people present at the demonstration at the Broadview Facility on September 26, 2025, led to their selection of the four remaining defendants for federal prosecution because of their protest activities and/or their outspoken opposition to the Trump administration's immigration enforcement efforts. The second category of discovery requested relate to materials relevant to the defense of this case in the event

1

it proceeds to trial, namely: (a) records relating to "Agent A's" training related to the use of his vehicle around crowds; and (b) any and all DHS and Broadview internal communications as well as communication between DHS and local authorities from on or before September 26, 2025, related to the management of crowds and flow of traffic outside the Broadview facility.

To be clear at the outset of this motion, Defendants do not contend—nor are they required to show—that the line AUSAs in this case harbored animus toward the Defendants charged in the case. Rather, it is enough to obtain relief to make a *prima facie* showing that they were charged because of their public statements criticizing the Trump Administration's immigration policies, particularly as it is clear that the "Fifth Amendment forbids the government from punishing defendants for exercising their constitutional and statutory rights." *United States v. Zakhari*, 85 F.4th 367, 379 (6th Cir. 2023). As explained below, ample evidence supports a *prima facie* showing sufficient to warrant the requested discovery for two principal reasons.

*First*, it is well-documented that President Trump and his administration, without precedent, have repeatedly and openly taken steps to improper bend the Department of Justice toward his personal and political interests. Indeed, illustrating the White House's influence over the once independent Department of Justice, just two weeks ago a large banner with President Trump's image was placed over the front entry way of the Department of Justice headquarters in Washington D.C. (depicted below).

2



The public record is replete with public admissions regarding the weaponization of the Department of Justice and federal courts to retaliate against perceived political enemies and those that oppose its agendas, as reflected in federal court dockets, from administration officials' own mouths.[1] Since Watergate, there had been a strong norm that the White House would not and did not direct specific targets, investigations or criminal cases. There is *prima facie* evidence that the Trump White House has repeatedly crossed that line and that it did so in this case in going after its "enemies."

For example, the record readily shows how the Trump Administration and its allies have expressly targeted Ms. Abughazaleh on numerous occasions in response to her public criticisms of it and its aggressive immigration enforcement tactics. On September 19, 2025 -- widely-spread video captured a CBP officer grabbing Ms. Abughazaleh by the chest and violently slamming her

---

[1] *See* Chris Whipple, *Susie Wiles, JD Vance, and the "Junkyard Dogs": The White House Chief of Staff on Trump's Second Term*, Vanity Fair, Dec. 16, 2025 (available at: https://tinyurl.com/4eth46b6).

to the pavement. Later that day, after Ms. Abughazaleh posted the disturbing video online, the White House Press Office issued a statement featuring the video, saying, "Obstructing law enforcement (which is what you just posted a video of yourself doing) isn't a First Amendment right. It's a crime."[2]

Then, on October 3, 2025, one week after Agent A's SUV turned into the Defendants and others at the Broadview Facility that led to the charges in this case, and 20 days before the indictment was returned, Ms. Abughazaleh went back to the Broadview Facility and delivered a speech at a press conference attended by elected officials, including Mr. Rabbitt. Flanked by elected officials, Ms. Abughazaleh began her five-minute speech by decrying the ICE's violent tactics, stating, "I am one of hundreds of people who have been brutalized by ICE while protesting the inhumane conditions at the Broadview processing center over the past few weeks."[3] She added how ICE responded to community engagement with brutality, including with "tear gas, pepper and rubber bullets, some shot by snipers on roofs, flash bangs, physical violence, vehicles ramming through civilians, and abductions of protestors and the press."

Later that same day, Ms. Abughazaleh appeared on MSNBC's "The Briefing" and spoke about the press conference.[4] In addition to describing the conditions at the Broadview Facility, including how ICE abducted protestors and targeted press, and repeated that ICE has "tried to drive vehicles through protestors multiple times." *Id*. Also present at the Broadview Facility on October

---

[2] Post by White House Deputy Press Secretary Abigail Jackson (@ATJackson47), available at: https://x.com/atjackson47/status/1969062022466744425?s=10 (last visited March 9, 2026). *See also*, Laura Loomer, Sept. 19, 2025, X, "I love watching communists get body slammed by ICE. Communist and Palestinian. Pick a struggle. @KatAbughazaleh"
(https://x.com/LauraLoomer/status/1969078211670638897) (last visited March 9, 2026).
[3] A video of Ms. Abughazaleh's comments at this press conference is available here: https://tinyurl.com/3drun9ke (last visited Mar. 11, 2026).
[4] Ms. Abughazaleh's October 3, 2025, MSNBC interview is available here: https://www.youtube.com/watch?v=r-TjXe10tCE (last visited Mar. 2026).

3, 2025, were then-DHS Secretary Krisi Noem and then-CBP Chief Gregory Bovino. During the interview, Ms. Paski played a clip of Noem at the Broadview Facility, and Ms. Abughazaleh responded by stating that Noem "should have consequences" and should be "tried at the Hague" for "crimes against humanity." *Id*. She then added how the response by ICE to people exercising their First Amendment rights is to "drive vehicles through them" and to "shoot them." *Id*.

Without delay, the White House reacted directly to Ms. Abughazaleh and her protected First Amendment speech. As reported in a Fox News article published on October 3, 2025, hours after Ms. Abughazaleh's comments and interview and entitled, *DHS rips 'dishonest, desperate' Gen Z candidate who raged against Kristi Noem's 'crimes' at anti-ICE protest* DHS Assistant Secretary Tricia McLaughlin, then the key mouthpiece for and aggressive defender of the Administration, personally attacked Ms. Abughazaleh as, "Dishonest, desperate and demonizing law enforcement to try to get 5 minutes on MSNBC and some fundraising cash."[5] According to the article, McLaughlin "accused Abughazaleh of putting 'law enforcement at risk' in her pursuit to 'obstruct justice' before she was shoved to the ground two weeks ago." *Id*. In addition to giving space for DHS to attack Ms. Abughazaleh, the October 3, 2025, Fox News article prominently included two photographs of Ms. Abughazaleh with a megaphone outside the Broadview Facility, from September 26, 2025—the day of the alleged "spontaneous conspiracy." *Id*.

The express targeting of Ms. Abughazaleh is so obvious as to have been noted in the mainstream media, as portrayed in this "Enemies List" broadcast on national television. Significantly, the "Enemies List" expressly includes congressional candidate, Ms. Abughazaleh,

---

[5] Deirde Heavy, *DHS rips 'dishonest, desperate' Gen Z candidate who raged against Kristi Noem's 'crimes' at anti-ICE protest, Congressional candidate Kat Abughazaleh's confrontation with federal agents went viral after she was shoved to the ground during a protest,* Fox News, Oct. 3, 2025 (available at: https://tinyurl.com/3drun9ke) (last visited Mar. 11, 2026).

along with other politicians and public figures who have opposed or spoken out against aspects of the Trump Administration's agendas:[6]



These give rise to a *prima facia* showing sufficient to warrant discovery into any role the White House may have had in influencing, in not directing, the prosecution of this case.

    *Second*, the selection of the specific individuals originally charged in this case, and especially the four remaining defendants, raises serious questions about the propriety of government's charging decisions. The following facts are plainly apparent from the various video evidence and cannot be disputed: No defendant utilized or exerted any force against the agent. No defendant threatened the agent or made any threat whatsoever. No defendant did anything to intimidate the agent. No defendant scratched the vehicle. No defendant etched the word "Pig" onto

---

[6] *See* The BEAT with Ari Melber, MSNOW, February 13, 2026.

the vehicle. No defendant pulled the wiper blade off the vehicle. On the contrary, the conduct of the four people selected to be charged in this case (like the two individuals the government has now voluntarily dismissed from the indictment) was quite benign, and consistent with the lawful exercise of their First Amendment rights and with passive resistance protest that has been a hallmark of civil protest in this country since at least the Civil Rights Era.

Despite almost nonexistent evidence against the defendants, the government chose to indict them for a claimed "spontaneous conspiracy," a felony. The one commonality among these four defendants is that via social media platforms and public statements they were all outspoken critics of the Trump Administration. They all specifically vocalized their criticism of Operation Midway Blitz and the violence perpetrated by federal agents at the Broadview Facility and elsewhere.[7] Perhaps most salient, all four defendants who remain charged in this case are Democrats who either hold public office (Messrs. Rabbit and Straw), is a candidate for public office (congressional candidate, Ms. Abughazaleh), or works for the Democratic Congressional campaign (Mr. Martin). Notably, of the two defendants the government has dismissed from the indictment, one did not hold and did not seek public office (Ms. Walsh) and other withdrew her candidacy for public office as a direct result of her being charged in this case (Ms. Sharp).

These two factors warrant an examination of the charging decisions in this case to ensure they were not made for improper purposes directed by the White House or associates of the Trump Administration. Put simply, the defendants, the Court, and the public deserve an answer as to whether this prosecution was brought for unconstitutional retaliatory and/or selective reasons.

Defendants also seek production of discovery related to "Agent A's" training (or lack thereof) related to the use and operation of his vehicle around crowds, particularly those engaged

---

[7] Notably, a number of the defendants were personally subjected to the federal government's excessive force at Broadview in incidents that went "viral" online.

in First Amendment activity, and any and all communications between DHS and local authorities, specifically Broadview Police Department, on and before September 26, 2025, related to interactions with crowds or protesters at the Broadview facility. The requested discovery is material and relevant to anticipated defenses that will be raised both before and during trial.

## I.     **Background**

In early September 2025, the U.S. Immigration and Customs Enforcement (ICE), supported by other law enforcement entities, unleashed an operation that it called "Operation Midway Blitz." This operation involved shocking displays of violence by federal law enforcement officers across Chicago and neighboring suburbs. It also involved the apprehensions of numerous individuals, often grabbed after being profiled because they spoke Spanish, looked Latino, or worked certain jobs, and were thus deemed by DHS agents on those bases alone as suspected violators of immigration laws. Once apprehended, these individuals were typically taken to a facility in Broadview, Illinois that was used for immigration processing and detention (hereafter, the "Broadview Facility"), before being transported to other detention facilities, typically outside of Illinois and away from family and friends.

While the Broadview Facility had been the site of protests, demonstrations, and religious gatherings for many years, Operation Midway Blitz resulted in a surge of immigration actions and indelible images of ICE and Customs and Border Patrol (CBP) officers violently interacting with citizens, and a corresponding increase in the number and size of protests and demonstrations at the facility. As the number of demonstrators increased at the Broadview Facility, so did the aggressiveness of ICE and CBP's response to those peaceful protesters.

On September 26, 2025, each of the Defendants along with dozens of other individuals arrived outside the Broadview Facility to voice their dissent to "Operation Midway Blitz." Starting

early in the morning, protestors engaged in what is called a "Jericho Walk," which involved walking back and forth across a public crosswalk at the intersection of Harvard and 25th Street. This was done under the watchful eye of the Broadview Police Department, which had multiple officers present at the intersection permitting the protestors to "Jericho Walk" for hours. Throughout the morning of September 26, 2025, Broadview Police officers helped control traffic, including by halting the "Jericho Walk" and parting the crowd of protestors when vehicles sought to pass through the crosswalk to either enter or leave the facility. That was a regular occurrence throughout the morning as numerous vehicles passed through the crosswalk without incident.

By 7:45 am, the crowd of protestors gathered at the intersection of Harvard and 25th Street had grown larger. At that approximate time, a large black Ford Expedition SUV driven by an ICE agent and heading south on 25th Street, without any warning, made a right turn (west) directly into peaceful protestors who were gathered at the intersection, many of whom were doing the "Jericho Walk" as they had been for some time that morning and in the preceding days. The ICE agent did not wait for the Broadview Police to clear a path in the crowd, did not issue an order instructing the crowd to move aside, and did not identify himself, opting instead to drive (albeit slowly), directly into the crowd.

Video recordings now in the possession of both the government and the defense show Defendants standing near different areas of the SUV as it turned into the crowd of people. When the Agent's SUV made contact with people standing in front of the SUV, Defendant Martin exclaimed, "Whoa! Whoa!" Recordings also show various Defendants promptly moving away from the SUV after it turned into them, being pushed into the SUV by those behind them, or being alongside the SUV as the Agent continued to drive through the crowd at a slow rate of speed and toward the Broadview Facility. Videos also show Defendants Martin and Abughazaleh moving

away from the SUV, retreating to the corner, and Ms. Abughazaleh grabbing a megaphone to tell others to come back before exclaiming to a police officer that he just let Agent A "run us over!" None of the video recordings provided by the government depict any Defendant causing (or attempting to cause) damage to the SUV, exerting any force against the agent, threatening the agent, or attempting to injure him in any way.[8]

Likewise, the discovery materials provided to date, do not reflect or contain any evidence that any Defendant had any discussion with anyone at the scene about intimidating, impairing, impeding, obstructing, threatening, or injuring any ICE agent. Indeed, the government has now acknowledged that it does not know of any such statements; nor does it intend to introduce such evidence at trial. In short, the conduct of the protesters and of these four Defendants were completely independent reactions unfolding in a totally unplanned way in response to a car driving through them without warning — the opposite of any purported conspiracy. Recognizing that there was no evidence of pre-planning or coordinated action, the Government recently announced to the Court that it was alleging this was a "spontaneous conspiracy."

Prior to their indictment in this case all Defendants were involved in various degrees in progressive politics and were outspoken public critics of the Trump administration. Many were at Broadview on a consistent basis before September 26. In particular, on September 19, 2025, Ms. Abughazaleh was present for a peaceful protest at Broadview and was violently thrown to the ground in an incident that was recorded and went viral on social media, was reported in the press, and is even included in the government's discovery production. Ms. Abughazaleh's experience on

---

[8] Based on conversations between defense counsel and the former AUSA assigned to this case it is defendants' position that the Government will concede that none of the four defendants charged in this case were responsible for any of the noted damage to the Agent's vehicle (broken rear windshield wiper and scratched graffiti on the side of the vehicle.). To the extent the Government will not concede this point, the videos clearly demonstrate the same point.

September 19 and presence on other occasions was particularly amplified due in large part because she is a candidate in the race for the seat in Illinois' 9th Congressional District, a fact which drew much attention from White House officials and several closely aligned conservative figures and public personalities.

Indeed, as noted above, after the September 19th incident, a White House Deputy Press Secretary accused Ms. Abughazaleh of committing a "crime" by "obstructing law enforcement" based on her protest activity at Broadview.[9] Fox News host Laura Ingraham said "Good Work" to the agent who thew Ms. Abughazaleh down, and Laura Loomer, a close Trump ally and influential voice in the White house, similarly praised the agent for body slamming Ms. Abughazaleh directly.[10] And when Ms. Abughazaleh posted a video of "Agent A" driving his SUV into the crowd on September 26, 2025, with the commentary, "At the Broadview ICE facility, an ICE agent tried to run dozens of protesters over with an SUV as we walked on a public crosswalk,"[11] United States Senator Ted Cruz of Texas along with other right-wing social media figures called again for her arrest and prosecution for her protest activity at Broadview.[12] Then, as noted above, on October 3, 2025, Ms. Abughazaleh spoke out against the Trump Administration, ICE, and Noem at

---

[9] Post by White House Deputy Press Secretary Abigail Jackson (@ATJackson47), available at: https://x.com/atjackson47/status/1969062022466744425?s=10 (last visited March 9, 2026).
[10] *See* Hilary Hanson, *Laura Ingraham Praises ICE Agent Who Threw Democratic Candidate to the Ground at Protest*, HuffPost, Sept. 20, 2025, available at: https://tinyurl.com/bdcmk42f (last visited March 9, 2026); Laura Loomer, Sept. 19, 2025, X, "I love watching communists get body slammed by ICE. Communist and Palestinian. Pick a struggle. @KatAbughazaleh"
(https://x.com/LauraLoomer/status/1969078211670638897) (last visited March 9, 2026).
[11] *See* Kat Abughazaleh (@KatAbughazaleh), available at:
https://x.com/KatAbughazaleh/status/1971567602003820796 (last visited March 9, 2026).
[12] *See* Ted Cruz (@tedcruz), available at: https://x.com/tedcruz/status/1971689170243670375 (last visited March 9, 2026).

Broadview and on MSNBC, only to draw the further ire of DHS officials accusing her of crimes. These publicly expressed wishes were soon fulfilled.[13]

Trustee Brian Straw likewise has been an outspoken critic of Operation Midway Blitz and the tactics employed by ICE agents in his role as an Oak Park Village Trustee. On August 5, 2025, Trustee Straw advocated for the termination of Oak Park's contract for Flock automatic license plate reader technology noting that such data has been—and would continue to be—used by ICE for immigration enforcement.[14] On September 19, 2025, Trustee Straw posted on Facebook, in response to federal agents using Village of Oak Park property as a staging area for immigration enforcement, that "the Village of Oak Park, Illinois is taking steps to restrict access to the parking lot at Village Hall to employees and those seeking to do business with Village Hall" to "ensure that our Welcoming Village Ordinance is truly meaningful."[15] On September 30, 2025, at a Village Board Meeting, Trustee Straw spoke out regarding DHS's false statements asserting the presence of "over 200" "lawless rioters" at the Broadview Facility on September 26, 2025. Trustee Straw noted that "the Federal Government is no longer a reliable source of information" and that "the Federal Government is attacking citizens, residents, and people exercising their constitutionally protected rights."[16] On October 21, 2025, Trustee Straw spoke out in favor of a local ordinance prohibiting the use of Village of Oak Park property for immigration enforcement noting the tactics of ICE and CBP agents who have been "looking for people who have brown skin and asking them

---

[13] Defendant Andre Martin was and is a senior member of Ms. Abughazaleh campaign and was publicly identified as such in online media. Also Mr. Martin, in that capacity, was routinely at Ms. Abughazaleh's side at campaign and protest events.

[14] *See* August 5, 2025, Village of Oak Park Board Meeting, *available at* https://oak-park.granicus.com/player/clip/2813 (last visited March 12, 2026).

[15] *See* Oak Park Village Trustee Brian Straw, *available at* https://www.facebook.com/permalink.php?story_fbid=pfbid02dLHTM26QHRWBH6t9xpiizE7JPus1GcP4kWug4P9mf6iKqzAb2AJ1HW9FNgdUkHjAl&id=100092585088685 (last visited March 12, 2026).

[16] *See* September 30, 2025, Village of Oak Park Board Meeting, *available at* https://oak-park.granicus.com/player/clip/2813 (last visited March 12, 2026).

for their papers, and if they cannot produce papers, . . . they abduct them for a period of hours while they attempt to confirm what their immigration status is."[17] Since September 26, 2025, Trustee Straw has been at Broadview on numerous occasions as part of peaceful protests and religious ceremonies conducted by leaders of his Church and other faith leaders in the community.

Similarly, Mr. Rabbitt, in his role as the 45th Ward Democratic Committeeman, has been a vocal opponent of Operation Midway Blitz and the mistreatment of detainees and peaceful protestors exercising their First Amendment rights--both leading up to and after the events of September 26th. For example, on September 6, 2025, Mr. Rabbitt spoke against ICE's presence in Chicago at a rally in Skokie hosted by Indivisible. On September 22, 2025, Mr. Rabbitt was one of 47 congressional, state, and local elected officials who signed a public letter denouncing violence by federal agents against peaceful protestors outside the Broadview facility. And one week following the events underlying the charges in this case, on October 3, 2025, Mr. Rabbitt was again present outside the Broadview facility and participated in a press conference on the same day that Kristi Noem, the now former Secretary of the Department of Homeland Security visited the area. That is the same October 3, 2025, press conference referenced above where Ms. Abughazaleh lambasted ICE's aggression, including by driving into protestors, decried the brutal conditions inside the Broadview Facility, and criticized Trump, ICE, and Noem for not even following the Geneva Conventions against U.S. citizens.

## II.    Department of Justice Investigation and the U.S. Attorney's Office's Decision to Indict These Four Defendants

One of the discovery requests the Government has refused to comply with relates to White House communications regarding what happened between the date of the September 19, 2026

---

[17] *See* September 30, 2025, Village of Oak Park Board Meeting, *available at* https://oak-park.granicus.com/player/clip/2868 (last visited March 12, 2026).

protest which was commented on by a White House press spokesperson and several others associated with the current administration, calling for arrest and prosecution of the public-figure protesters and the date of the indictment in this case (October 23, 2026), which includes September 26, the date of the alleged "spontaneous conspiracy" the government now espouses. That 34-day period is the focus of the Defendants' discovery requests which the Government has not shed any light on to date. The discovery tendered to date contains very little information about what investigation was being conducted during this time period by the FBI, DHS, or the Chicago U.S. Attorney's Office.

The circumstantial evidence regarding this 34-day period raises significant concerns and further establishes that Defendants have met their *prima facie* showing (discussed below) that the requested items are material to their defense.

## III.    <u>The Indictment and Discovery to Date</u>

On October 23, 2025, nearly a month after the SUV drove into the crowd of protestors, an indictment was returned that charged all defendants with a one count of conspiracy under 18 U.S.C. §372 and another count of "impeding, intimidating, and interfering," the ICE agent under 18 U.S.C. §111(a)(1).

Even though dozens of demonstrators were participating in a "Jericho Walk" when the SUV turned into them on Harvard St. and many of those demonstrators ended up placing their hands on the SUV at some point during the incident, the four individuals chosen for the indictment all are prominent public figures who have been outspoken against the administration's immigration enforcement policies. This includes public statements and social media posts describing both experiencing and witnessing the violence and aggression of ICE and CBP officers, something

14

which is now well-established by video evidence in a variety of cities that have been targeted for special operations by Homeland Security and the administration.

In addition to the §372 conspiracy charge, each defendant is charged with a misdemeanor under 18 U.S.C. §111(a)(1). (Indictment, Dkt. #1, Counts Two-Seven). Each of these individual counts generally and opaquely alleges that the named defendant "forcibly impeded, intimidated, and interfered with an officer of the United States, namely, Agent A, while engaged in or on account of the performance of his official duties," in violation of 18 U.S.C. §§111(a)(1) and 2. Here too, none of these counts allege or describe any specific action by any Defendant.

## IV.   Discovery Requests

The Defendants sent the Government four specific discovery requests: (1) December 1, 2025 (Ex. A); (2) December 3, 2025 (Ex. B); (3) December 11, 2025 (Ex. C); and (4) January 9, 2026 (Ex. D). The Government sent two responses to these discovery requests, producing some documents but refusing to produce most of the requested material and documents. See Govt. Resp. Letters: (1) December 18, 2025 (Ex. E) and (2) January 21, 2026 (Ex. F).

While the parties have been able to work out some of the discovery disputes on their own, the main remaining hurdle relates to three categories of information: (1) the discovery requests related to communications between the White House and members of the Trump Administration and the U.S. Attorney's Office for the Northern District of Illinois, all of which the government has refused to produce or deny the existence of; and (2) documents related to the training and directives to law enforcement regarding the handling of protests at the Broadview facility. For the Court's convenience we identify the outstanding discovery requests as to which we are requesting an Order compelling the government to produce be issued:

**Pre-Charging Communications From September 19, 2025 – October 23, 2025**

1.      All documents, including all communications sent to, from, between, or among law enforcement and government personnel, including White House staff and specifically White House Chief of Staff Susie Wiles, related to the posting, sharing, editing, or dissemination of video or still images of any of the defendants at the Broadview facility, including but not limited to on September 26, 2025, or any public comments and criticisms any of the defendants made about the Broadview Facility or the government's immigration enforcement activities in Chicago.

2.      Any and all records, including e-mails, memorandum, text messages, and telephone records related to the presentment of the investigation of the September 26, 2025, interaction between "Agent A" and individuals at the Broadview Facility to any member of the U.S. Attorney's Office for the Northern District of Illinois.

3.      Any and all records and communications including e-mails, memorandum, text messages, and telephone records between U.S. Attorney Andrew Boutros and any other individuals regarding the presentment and consideration for charging of the investigation of the September 26, 2025, interaction between Agent A and individuals at the Broadview Facility.

4.      All documents, including all communications sent to, from, between, or among law enforcement and government personnel, including White House staff, related to the posting, sharing, editing, or dissemination of video or still images of the events of September 19 and/or September 26, 2025, at the Broadview Facility.

5.      Any documents and communications sent to, from, between, or among any member of the prosecution team that refers in any way to any of the defendants': statements about the Broadview Facility, other immigration facilities, DHS, or ICE; other political or policy views; or political party.

6.      Any documents and communications reflecting the application of NSPM-7 to any of the defendants, including but not limited to investigating and federally charging defendants.

7.      Any documents or communications regarding any formal or informal administrative priorities, policies, or practices related to arrests and prosecutions of individuals alleged to have committed assault against law enforcement personnel or property. This request includes, but is not limited to, any communication that refers in any way to alleged offenders' political or policy views, or political affiliation or party.

8.      All records reflecting the identification of other individuals present with the charged defendants on September 26, 2025, including through the use of facial recognition technology, social media research, and all other investigation to identify others.

9.      All records, including videos, of all other incidents involving individuals gathered outside the Broadview Facility when government vehicles were entering or leaving the Facility, including any documents or communications which relate to who was identified through those investigations, and any indictments or charges that resulted from any of those incidents.

10.     Any documents and communications sent to, from, between, or among any member of the prosecution team that refers in any way to Ms. Abughazaleh's candidacy for the seat in the 9th Congressional District, the political activities of any defendant, the activities of any defendant in their capacity as an elected official, the pro bono work of any defendant in their professional capacity, or the charitable work of any defendant.

11.     Any documents and communications involving any White House officials or other Trump administration officials or advisors that have referenced any defendant, including in the context of effecting their arrests and/or prosecutions.

**Requests Related to Internal Communications/Orders/Directions to Law Enforcement:**

12.     All orders, directives, commands, memoranda, and/or communications to, from, among, or with representatives or agents of ICE, Border Patrol, the DOJ, Broadview Police, or any other federal or local law enforcement person(s) or entities relating to law enforcement activity, policies, procedures, tactics, permitted responses, use of force, or other conduct relating to protests and/or protester activity at or near the scene of the incident described in the indictment (the area outside the federal facility located at 1930 Beach Street, Broadview, Illinois) for the period August 1, 2025 through September 26, 2025.

13.     For the period April 1, 2025 through the present, all orders, directives, commands, memoranda, and/or communications to, from, among, or with representatives or agents of ICE, Border Patrol, the DOJ, the Executive Branch, Broadview Police, or any other federal or local law enforcement person(s) or entities relating to the First Amendment of the U.S. Constitution and protest activities at, or in the vicinity of, federal detention facilities that have been, or are being, used to hold or house detainees (even temporarily) who are alleged or suspected of being undocumented immigrants or persons believed or suspected to be subject to deportation by the U.S. government.

## V.     <u>Argument</u>

### A.     <u>Legal Standards for Motion to Compel</u>

Federal Rule of Criminal Procedure 16 requires the government to produce all "documents within the government's possession, custody, or control when the item is material to preparing the defense or the government intends to use the item in its case-in-chief at trial." Fed. R. Crim. P. 16(a)(1)(E). Evidence is material to preparing the defense if it would "significantly help[] in 'uncovering admissible evidence, aiding witness preparation, corroborating testimony, or assisting impeachment and rebuttal.'" *See United States v. Gaddis*, 877 F.2d 605, 611 (7th Cir. 1989)

(quoting *United States v. Felt*, 491 F. Supp. 179, 186 (D.D.C. 1979)). *See also United States v. Naggs*, No. 18-CR-130, 2020 U.S. Dist. LEXIS 157453, 2020 WL 5105792, at \*1 (E.D. Wis. Aug. 31, 2020). In other words, there must be some indication that the disclosure of the disputed evidence would enable the defendant "to substantially alter the quantum of proof in his favor." *United States v. Orzechowski*, 547 F.2d 978, 984 (7th Cir. 1976) (citation omitted); *see also United States v. Baker*, 453 F.3d 419, 425 (7th Cir. 2006) (quoting 2 Charles Alan Wright, Federal Practice and Procedure § 254 (3d ed. 2000)) (same). Notably, information may be material even if it is not exculpatory. *See United States v. Mackin*, 793 F.3d 703, 709-11 (7th Cir. 2015).

"To compel discovery pursuant to Rule 16(a)(1)(E), a "defendant must make at least a *prima facie* showing that the requested items are material to his defense." *United States v. Thompson*, 944 F.2d 1331, 1341 (7th Cir. 1991). "This materiality standard normally 'is not a heavy burden.'" *United States v. Lloyd*, 992 F.2d 348, 351, (D.C. Cir. 1993) (citation omitted). *See also United States v. Lucas*, 841 F.3d 796, 804 (9th Cir. 2016) (explaining that the *prima facie* showing of materiality is generally a "low threshold") (citation omitted). However, "[n]either a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the [g]overnment is in possession of information helpful to the defense." *United States v. Clarke*, 979 F.3d 82, 97 (2d Cir. 2020) (quoting *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990)), *cert. denied*, 141 S. Ct. 2581, 2021 WL 1602723 (2021). *See also United States v. Caputo*, 373 F. Supp. 2d 789, 793 & n.1 (N.D. Ill. 2005) ("To make a *prima facie* showing, a defendant cannot rely on general descriptions or conclusory arguments, but must convincingly explain how [discovery] will significantly help him uncover admissible evidence, prepare witnesses, or corroborate, impeach, or rebut testimony.") (collecting cases).

18

### a. Discovery Related to Selective Prosecution Claim

The Government has refused to comply with the simple and direct requests for communications from the White House or Trump Administration officials regarding this investigation and prosecution. Instead of simply stating that no such communications exist – which it almost certainly cannot do, given some of the facts recited above – the Government erroneously asserts that the Defendants have "not satisfied the threshold required" to obtain this type of discovery. Indeed, this response implies that such communications do, in fact, exist. (Ex. F, at 2).

The Defendants have established a *prima facie* case for discovery on selective prosecution based on their exercise of First Amendment rights. The evidence is clear that this prosecution is unconstitutionally selective. "A cardinal First Amendment principle is that '[t]he government may not enforce the laws in a manner that picks winners and losers in public debates.'" *Frederick Douglass Found., Inc. v. District of Columbia*, 82 F.4th 1122, 1142 (D.C. Cir. 2023). The Constitution does not permit the government to distinguish between those it chooses to charge and those whose behavior it chooses to ignore based on the actors' views, the content of their speech, or their partisan affiliation. *Id.*

Here, there is more than merely "some evidence" of that. The Trump Administration has made clear it is using the DOJ to silence political opponents. As the Brennan Center for Justice notes, National Security Presidential Memorandum -7 (NSPM-7), issued on September 25, 2025:

> directs federal agencies to prioritize investigations of a swath of identities and ideologies that it depicts as falling under "the umbrella of self-described 'anti-fascism.'" These include "anti-Americanism, anti-capitalism, and anti-Christianity; support for the overthrow of the United States Government; extremism on migration, race, and gender; and hostility towards those who hold traditional American views on family, religion, and morality."

> This breathtakingly broad list easily encompasses everyone from labor organizers, socialists, many libertarians, those who criticize Christianity, pro-immigration groups, anti-ICE protesters, and racial justice and transgender activists, to anyone who holds views that the administration considers to be "anti-American."

19

Faiza Patel, *Trump's Orders Targeting Anti-Fascism Aim to Criminalize Opposition*, Brennan Center for Justice, Oct. 9, 2025.[18] "[M]uch of NSPM-7 is squarely directed at speech and nonviolent action by organizations and individuals protected by the First Amendment." *Id.*

Here, these four defendants all had made public statements criticizing the Administration prior to being indicted and Ms. Abughazaleh had been widely identified as being on an "enemies list" linked to the Trump Administration. The actions of these four Defendants were some of the most minimal actions depicted in the videos of the incident, yet their voices against the Trump Administration were some of the loudest. Public reporting indicates that "Senior Trump White House officials and other officials in the Trump administration ha[d] been pushing for the Department of Justice to ramp up arrests, ***including of journalists, elected Democrats, [and] Democratic congressional candidates.*" *See* Asawin Suebsaeng and Liam Mann, *WATCH: Inside Trump's War on Chicago*, Zeteo, Oct. 23, 2025,(comments made at 6:52-7:12 of recording) (emphasis added).[19] Notably, the reporter informed Ms. Abughazaleh on the record that "[her] name has come up in these conversations." *Id.*

Additionally, the fact that this case was charged by an AUSA assigned to the public corruption section raised further concerns. The conduct depicted in the videos of the incident rises no further than perhaps a state disorderly conduct investigation, yet somehow the investigation made its way to the desk of a federal prosecutor assigned to investigate public officials for government misconduct. An investigation this minor coming out of the public corruption section of the Chicago U.S. Attorney's Office seems at odds with past practice of the Office. In evaluating a selective prosecution claim, "the "government's failure to follow its normal prosecutorial

---

[18] Available at: https://www.brennancenter.org/our-work/research-reports/trumps-orders-targeting-antifascism-aim-criminalize-opposition.
[19] Available at: https://tinyurl.com/sj2ds2sw (last visited Nov. 24, 2025).

procedures mandates stricter judicial scrutiny of the prosecution." *United States v. Haggerty*, 528 F. Supp. 1286, 1293 (D. Colo. 1981). *See also, e.g.*, *United States v. Ojala*, 544 F.2d 940, 943 & n.2 (8th Cir. 1976). Here, the "government's prosecutorial measures . . . can only be characterized as abnormal." *Haggerty*, 528 F. Supp. at 1293.

The evidence clearly establishes a *prima facie* case that the Administration sought to bring this prosecution in order to silence these Defendants—and dissent more broadly. Public reporting shows that the Administration was specifically seeking to use NSPM-7 to prosecute "elected Democrats", such as Defendants Straw and Rabbitt, and "Democratic congressional candidates", such as Ms. Abughazaleh. Indeed, the incident at issue in this case occurred ***exactly one day after the administration announced NSPM-7*** and announced its intention to investigate and prosecute individuals it believes to hold ideals which it proclaims as aligned with "anti-fascism" or "anti-Americanism."

### b. Discovery Related to Vindictive Prosecution Claim

All four defendants charged here are public officials (or work for a public official) and had made public statements criticizing the Administration for the shocking and often lawless conduct being committed at Broadview prior to the indictment being returned. The discovery sought which the Government refuses to tender will likely further illuminate the reasons for their selection as opposed to the dozens of other individuals present that day who were engaged in identical conduct and had virtually identical interaction with Agent A's SUV as the four Defendants, but who were not charged in this case.

For vindictive prosecution, a defendant is entitled to discovery and an evidentiary hearing if he provides some "objective evidence tending to show the existence" of vindictiveness, under the above elements. *United States v. Wilson*, 262 F.3d 305, 315 (4th Cir. 2001). A vindictive

21

prosecution is one in which the government is retaliating against someone who was "exercising a protected statutory or constitutional right." *United States v. Goodwin*, 457 U.S. 368, 372 (1982). Vindictive prosecution violates the Due Process Clause of the Fifth Amendment, and can be proven in two ways. *First*, the defendant can establish "actual vindictiveness"—*i.e.,* direct evidence that the prosecutor harbored a personal animus toward the defendant. *United States v. Esposito*, 968 F.2d 300, 303 (3d Cir. 1992). *Second*, a defendant can succeed by showing "a reasonable likelihood of a danger that the [government] might be retaliating against the accused for lawfully exercising a right." *Id.* (citing *Goodwin*, 457 U.S. at 372). ***In the latter situation, courts apply a "presumption of vindictiveness"; to overcome that presumption, the government must show "legitimate, objective reasons for its conduct."*** *United States v. Paramo*, 998 F.2d 1212, 1220 (3d Cir. 1993) (emphasis added).

Here, the Trump Administration has a demonstrated track record of using indictments as a may to silence its critics. While many grand jurors across the country have stood in the way of these vindictive actions, the grand jury system cannot be the only line of defense against vindictive prosecutions by this Administration. In a recent case, *United States v. Carey*, 25 CR 251 (Jan. 20, D.D.C. 2026), the court allowed a defense of vindictive prosecution to proceed to determine if a defendant was impermissibly charged for engaging in free speech activity. In *Carey*, after President Trump issued an executive order directing DOJ to prosecute anyone engaged in the First Amendment protected speech of burning a flag, Mr. Carey was charged by the Government after burning an American flag in Lafayette Park. *Id*. R.22, at 1. The court noted, "while the Government can prosecute someone because he broke the law, it cannot prosecute him in retaliation for exercising his rights." *Id*. at R. 22, at 11. The court expressly found that retaliation by the Government against a defendant for exercising his right to free speech "before he was

22

charged" can "give rise to a defense of vindictive prosecution." *Id*. Viewed in light of the other contextual facts recited herein, this reasoning applies with even greater force here.

In addition to their public comments discussed above critical of Operation Midway Blitz and the Administration's policies related to immigration enforcement, the Defendants here were all engaged in protected First Amendment activity, notably exercising their freedom of assembly and freedom of speech through peaceful protest. The discovery sought here is both necessary and material to the defendants' ability to file their motion to dismiss the indictment based on vindictive prosecution grounds.

Importantly, to prevail on such a motion, the Defendants do not need to show animus of the line AUSAs or to the U.S. Attorney here in Chicago, nor are we alleging such. Rather, the required animus may be imputed to a prosecutor when an external force "in some way prevailed upon the prosecutor in making the decision to seek an indictment." *United States v. Monsoor*, 77 F.3d 1031, 1035 (7th Cir. 1996). *See also United States v. Adams*, 870 F.2d 1140, 1146, 1148 (6th Cir. 1989) (vacating conviction and granting defendant's request for discovery on the issue of whether "the EEOC, acting on an improper motive, induced the Department of Justice to institute a prosecution that would not otherwise have been undertaken"); *United States v. Koh*, 199 F.3d 632, 640 (2d Cir. 1999) (recognizing that vindictive prosecution may be established when prosecutor was "prevailed upon to bring the charges by another with animus"). The reasoning and holdings of these cases seem squarely to fit the facts known to date here; at a minimum, there is good reason to compel discovery, particularly given the presumption of vindictiveness Defendants have in this circumstance.

B. **The Court Should Order Discovery on Training and Communications**

Defendants are entitled to know "Agent A's" training, experience, and instruction (or lack thereof) regarding how to drive his vehicle near crowds of people, particularly those exercising their First Amendment rights. The Defendants are also entitled to know what type of instructions were given to officers and agents working at and around the Broadview Facility on how to handle these issues – both as a general matter and specifically in the lead-up to September 26, 2025. The fact that protestors were outside the Broadview facility and at the intersection of Harvard and 25th on September 26, 2025 was not a surprise; the protests had been going on for weeks prior, and were obediently being conducted in a location specified by the Village of Broadview. They were exactly where the Broadview police officers permitted them to be for days and hours before "Agent A" drove into them. Whether "Agent A" had any training or instruction – whether generally or specifically for his conduct that day – bears directly on who was the aggressor—the crowd of people exercising their First Amendment rights, or the individual who drove his vehicle into the crowd, no matter how slowly. Discovery related to officer training is material to the defense and is needed for cross-examination of the multiple Broadview police officers the Government has already subpoenaed for trial testimony, as well as the critical cross-examination of "Agent A."

As discussed above, prior to September 26, 2025, President Trump had clearly indicated he intended to deploy the National Guard to Chicago and was actively seeking a reason to do so. Indeed, on September 26, DHS issued a memorandum requesting "immediate and sustained assistance from the Department of War." *Illinois v. Trump*, No. 25-CV-12174, 2025 WL 2886645, at *3 (N.D. Ill. Oct. 10, 2025). It is apparent that the Trump administration was actively seeking conflicts which it could characterize as a "coordinated assault by violent groups intent on obstructing lawful federal enforcement actions" in order to trigger a Guard deployment. *Id.*

There is also extensive evidence in other Operation Midway Blitz cases which demonstrates that these agents are in frequent text communication, both regarding operational issues and to brag to about their handling of protestors. In the case of Marimar Martinez, which was dismissed with prejudice on November 20, 2025 after various discovery materials were ordered to be produced, DHS agents were in communication with each other through text messages discussing the facts of the case and made material admissions that were flatly inconsistent with statements they provided in their interviews to law enforcement about the case. In another case which was ultimately dismissed, Scott Sakiyama reported seeing text messages exchanged between federal agents in a text thread entitled "Chiraq Team 2." Dave Byrnes, *'Chiraq Team 2':* *Oak Park attorney catches glimpse of federal agents' group chat during arrest*, The TRiiBE, Oct. 21, 2025.[20] Discovery related to the communications of "Agent A" is plainly material to determining what information and instructions he had received prior to arriving at the Broadview Facility on September 26—including whether he was instructed to drive through the crowd without waiting for the Broadview police officers to part the way (as they had been doing all morning and in the days prior) in order to create a situation the Trump administration could rely on to support deploying the National Guard or taking other actions based on a claimed "insurrection".

---

[20] Available at: https://thetriibe.com/2025/10/chiraq-team-2-oak-park-attorney-catches-glimpse-of-federal-agents-group-chat-during-arrest/ (last visited March 12, 2026).

## VI.   <u>Conclusion</u>

For the foregoing reasons, Defendants respectfully request that the Court grant this motion to compel.


Respectfully submitted,

<u>/s/ Nancy L. DePodesta</u>
<u>/s/ Carly Alana Chocron</u>
Taft Stettinius & Hollister LLP
111 E Wacker Dr, Suite 2900
Chicago, IL 60601
312-836-5884
ndepodesta@taftlaw.com
cchocron@taftlaw.com
*Attorneys for Michael Rabbitt*

<u>/s/ Joshua G. Herman</u>
Law Office of Joshua G. Herman
53 W. Jackson, Blvd., Suite 404
Chicago, IL 60604
312-909-0434
jherman@joshhermanlaw.com
*Attorney for Katherine Marie Abughazaleh*

<u>/s/ Theodore Thomas Poulos</u>
<u>/s/ Terence H. Campbell</u>
<u>/s/ Valerie Ann Davenport</u>
Cotsirilos, Poulos & Campbell, Ltd.
55 E. Monroe Street, Suite 3250
Chicago, IL 60603
312-263-0345
tpoulos@cotsiriloslaw.com
tcampbell@cotsiriloslaw.com
vdavenport@cotsiriloslaw.com
*Attorneys for Andre Martin*

<u>/s/ Christopher Parente</u>
<u>/s/ Damon M Cheronis</u>
Cheronis & Parente
140 S. Dearborn, Suite 404
Chicago, IL 60603
773-458-4899
cparente@cheronislaw.com
damon@cheronislaw.com
*Attorneys for Brian Straw*